## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SANDRA MUNIZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:13-2002 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In this appeal from a denial of Social Security benefits, Plaintiff Sandra Muniz

has filed a First Amended Motion for Summary Judgment [Doc. # 22] ("Plaintiff's

Motion").  Defendant also has filed a Motion for Summary Judgment [Doc. # 23]

("Defendant's Motion") and brief in support [Doc. # 24].  The motions now are ripe

for decision.  Having considered the parties' briefing, the applicable legal authorities,

and all matters of record, the Court concludes that Defendant's motion should be

**granted** and Plaintiff's motion should be **denied**.

## I.     BACKGROUND

### A.     Procedural Background

Plaintiff Sandra Muniz filed an application with the Social Security

Administration ("SSA") on January 31, 2011, seeking supplemental security income ("SSI") benefits under Title XVI and disability benefits under Title II.  She alleges onset of disability on June 7, 2010.  After being denied benefits initially and on reconsideration, Muniz timely requested a hearing before an Administrative Law Judge ("ALJ") to review the denial.

On May 23, 2012, Plaintiff appeared before ALJ John D. Sullivan for an administrative hearing.  R. 34-70.  She was represented by attorney Donald Dewberry. The ALJ heard testimony from vocational expert Byron J. Pettingill.

On June 25, 2012, the ALJ denied Plaintiff's request for benefits.  R. 16-33. On May 8, 2013, the Appeals Council denied Plaintiff's request for review.  R. 1-6. Plaintiff filed this case on July 8, 2013, seeking judicial review of the Commissioner's denial of her claim for benefits.  Complaint [Doc. # 1].

**B.    Factual Background**

Muniz alleges disability on the basis of diabetes mellitus, chronic obstructive pulmonary disorder ("COPD"), peripheral vascular disease, obesity, anxiety disorder, and hypertension.  The time period relevant to Muniz's disability benefits application is June 7, 2010 (her alleged onset date) through June 25, 2012 (the date of the ALJ's adverse decision).  For her SSI application, Muniz's eligibility began on January 31,

2011 (her application date).[1]  Muniz sometimes is referred to in the record as Sandra Ann Perales, her previous name.  R. 41.

On May 10, 2010, just before the relevant period for this case, Muniz was admitted to Bayshore Medical Center complaining of coughing, wheezing, and shortness of breath.  R. 849-937, 1122-1132, 1635-41.  She was diagnosed with acute asthma exacerbation, acute bronchitis, uncontrolled diabetes, and tobaccoism.  R. 1125.  Her records also note obesity, COPD, hypertension, and hyperlipidemia.  R. 1122-24.  She was an active smoker and was prescribed a nicotine patch and advised regarding smoking cessation.  She also was prescribed antibiotics and a changed nebulizer treatment.  R. 1125.  Her records contain various blood pressure readings including 137/63, 119/64, and 141/79.  She was discharged on May 13, 2010, in stable condition and instructed to follow up in one week.  R. 1125.

On September 13, 2010, Muniz was treated at Clear Lake Regional Medical Center for shortness of breath and cough.  R. 1098-1113.  She reported a history of emphysema.  Various tests were performed and Muniz was administered nebulizer treatment.  Upon her discharge several hours later, her respirations were even and unlabored.  R. 1113.  Muniz stated that she felt better and denied chest pain.  R. 1112-

---

[1]     The record in this case contains hundreds of pages of medical records from 1987 through 2009, which are outside the relevant period for the disability application at issue.  *See*, *e.g.*, R. 260-841, 1133-1511, 1565-84, 1660-89.

13. Blood pressure readings in the records include 151/94 and 167/75. R. 1107, 1109.

On January 16, 2011, Muniz was admitted to Bayshore Medical Center after fainting and being transported by ambulance to the emergency room. R. 842-48, 950-55, 1073-97, 1539-52, 1630-34.   She stated that she had not been taking her medications for one month since moving from Alvin to Pasadena. R. 844.   She complained of chest pain and loss of consciousness. R. 844.   While in the hospital she was administered multiple tests, including a stress test, a chest x-ray, an electrocardiogram, and a CT scan of her head and brain. R. 843, 845.   Upon discharge she was assessed with a diagnosis of "status post syncopal episode," with additional diagnoses of uncontrolled diabetes, uncontrolled hypertension, COPD, anxiety, and hypertriglyceridemia. R. 842.   She was discharged on January 17 with instructions to continue her medications. R. 842-43.   She stated that she had quit smoking. R. 845.   The records contain various blood pressure readings including 133/59, 135/79, 142/72, 119/54, 140/67, 159/66, and 140/58.   She was discharged with medications for cholesterol, asthma, and diabetes.

On March 2, 2011, Muniz again was treated at Clear Lake Regional Medical Center. R. 1059-72, 1554-63.   She complained of chest pain lasting three days that was worse with a deep breath, along with nausea and dizziness.   Her blood pressure readings were 159/63, 155/60, 149/68, and 142/62.   She was discharged that same day

in stable condition. R. 1071.

On March 4, 2011, Muniz began treatment at El Centro de Corazón Clinic.  R. 962-975.  She stated that she had been out of her diabetes medication for one month. R. 972.  She reported a history including hypertension, diabetes, anxiety, and varicose vein pain, and heart disease.  She stated that she had recently been treated in the emergency room for syncope (fainting), and had not been seeing a doctor regularly. Her blood pressure readings were 159/102 and 148/102.  She reported smoking one or two cigarettes per week.  She was given orders for laboratory tests and prescriptions for hypertension, diabetes, and cholesterol, among others.  She also was given a referral for treatment of her anxiety.  She was instructed to follow up for her hypertension and other conditions.

On March 24, 2011, Sharon Swanson, Psy.D., conducted a consultative examination of Muniz.  R. 941-47.  Muniz reported her problems with anxiety, diabetes, high cholesterol, hypertension, and COPD, including past hospitalizations for diabetes complications, cardiac problems, and her anxiety attack in January 2011. She stated that, in January 2011, she had not been taking her medications because she had run out, and that she could not afford them.  She also stated that she had smoked cigarettes since age twelve and was trying to stop.  Muniz described a tumultuous childhood, including some periods living on the streets.  She stated that she lived with

her son and two daughters and a two-year-old granddaughter.  Muniz had completed sixth grade but had problems in school, including problems with attention and concentration due to her family problems.  She stated that she was currently unemployed but in 2010 had worked for six months in a delicatessen, until she "got sick so she had to quit."  R. 943. She also had worked at Walmart from 2000 through 2005, but quit because of illness.  Muniz "indicated that often times when she got sick, it was because she ran out of medication and got nervous around people."  R. 943.

Dr. Swanson reviewed Muniz's reported decreased activity and social functioning, noting her lack of motivation to be social, her fatigue, and her difficulty completing tasks in a timely manner.  She observed, "It appears emotionally she is decompensated over the last two months, which may be in part due to her not taking any of her medications."  R. 944.  Dr. Swanson observed Muniz's adequate hygiene and eye contact, and noted no abnormalities in speech, rapport, thought process, or thought content.  She assessed Muniz's memory as adequate, her concentration as intact, and her judgment as fair.  She observed Muniz's dysphoric mood, tearfulness, social isolation, and diminished interest in activities.  She diagnosed Muniz with anxiety disorder "not otherwise specified" and with a Global Assessment of Functioning score of 75 (*i.e.*, a slight impairment).  R. 946.  She concluded:

Ms. Muniz has a moderate prognosis of maintaining employment

provided that she seeks psychotherapy, continues to seek psychiatric care, and consistently takes her psychotropic medication as prescribed and deemed necessary by the psychiatrist. ***It appears at the present time that part of her emotional difficulties is that she has not been on her medications for the last two months.***

R. 946 (emphasis added).

On April 16, 2011, Muniz was treated at Bayshore Medical Center after a fight with her teenage son.  R. 1044-1058, 1585-97.  Muniz arrived by ambulance complaining of chest pain radiating to her left arm, shortness of breath, and nausea. Her blood sugar was 184, and her blood pressure was 178/73.  R. 1045.  Other blood pressure readings were 150/78 and 154/77.  R. 1053-54.  She stated that she had a fight with her fifteen-year-old son and that he had slapped her in the face.  The Pasadena police had been called.  Muniz received a chest x-ray, which showed no evidence of acute cardiopulmonary process.  R. 949.  She was discharged the next day, on April 17, 2011.

Soon thereafter, on April 25, Muniz returned to the clinic at El Centro de Corazón.  R. 976-81.  She stated that she was compliant with her medications and dietary restrictions.  She complained of high blood sugar and anxiety and requested refills on her medications.  She had missed her follow-up appointments for treatment of her anxiety.  She was stressed by the fight with her son and other issues and feared another panic attack.  Her hypertension was described as "stable" (blood pressure

recorded as 120/80) and her diabetes as "much improved" (glucose was 130).  R. 977-78.  She was given prescriptions and was referred to a cardiologist for treatment of her chest pain.  R. 978.  Muniz also was scheduled for a same-day appointment for treatment of her anxiety and was started on an antidepressant and a self-care plan.  She was given guidance and counseling for coping with her stressful family situation and her son's upcoming court appearance.  R. 980-81.

On April 29, 2011, a consultant for the SSA reviewed Muniz's mental health records and concluded that her mental impairment was not severe.  R. 982-95.  The consultant assessed Muniz with no limitations in daily living activities or social functioning and no episodes of decompensation, noting that she was able to care for her children, watch television, do word searches, cook and do laundry, and maintain social relationships.  She stated that Muniz's allegations were supported by the evidence but were not "severely limiting in function."  R. 994.

On May 13, 2011, a consultant reviewed Muniz's medical records and concluded that her allegations were only partially supported by the medical evidence of record.  R. 996-1003.  She assessed Muniz as capable of standing, walking, or sitting for six hours in an eight-hour workday.  R. 997.  She noted no postural, manipulative, visual, communicative, or environmental limitations. R. 998-1000. She reviewed Muniz's allegations of hypertension, high cholesterol, diabetes, COPD, sleep

apnea, chest pain, and peripheral artery disease.  She reviewed the records of Muniz's treatment for asthma exacerbation in May 2010 and fainting in January 2011.  She concluded that Muniz's allegations were "partially supported" by the medical evidence of record.  R. 1003.

In June 2011, Muniz again was treated at the Clear Lake Regional Medical Center in the emergency room.  R. 1028-43, 1625-29.  She complained of blood-tinged diarrhea and abdominal pain for more than one month.  Doctors performed a CT scan of her abdominal area and a chest xray.  Muniz was assessed with diarrhea and a urinary tract infection, given antibiotics, and discharged on June 22.  R. 1041, 1625-29.  In early July, multiple tests were performed at Clear Lake Regional Medical Center, including an endoscopy and biopsies of the stomach, small intestine, and colon.  R. 1025-26, 1621-23, 1651.

On July 26, 2011, Muniz returned to the emergency room at Clear Lake Regional Medical Center for treatment of swelling to her face and legs.  R. 1015-24. She stated that she had been out of her medications for hypertension and diabetes for one week.  She reported that she smoked every day.  Her blood pressure was 153/82. She was discharged on July 27 after her condition improved.  R. 1023.

In August, Muniz began treatment at the Stephen F. Austin Community Health Center in Alvin.   At her initial appointment on August 9, she stated that she was

compliant with her medications and dietary restrictions, and sought medication refills for diabetes, hypertension, cholesterol, and COPD. She stated that she smoked two cigarettes per day. Her blood pressure was 116/66. She was instructed to check her blood sugars at home, exercise, lose weight, practice diabetic foot care, and return to the clinic in one week. R. 1690-93. At a follow up appointment on August 11, R. 1694-96, her blood pressure was 128/76. Her lab results were reviewed and her medications were adjusted. She received referrals to ophthalmology for diabetic eye care and to cardiology for peripheral vascular disease. She was seen again on August 17 and told to return in three months. R. 1697.

In September 2011, Muniz again was assessed by several consultants for the SSA. The consultant assessing her physical limitations reviewed her records for treatment of asthma exacerbation and bronchitis in May 2010; fainting, diabetes, and hypertension in January 2011; chest pain in March 2011; swelling to her legs and face in June 2011; and various testing and biopsies in July 2011. R. 1699-1706. He assessed her as having no postural, manipulative, visual, communicative, or environmental limitations. He opined that she could stand, walk, and sit for six hours in an eight-hour workday. R. 1700.

A different consultant assessed Muniz's psychiatric state, and considered her allegations of anxiety and depression. R. 1707-20. The consultant concluded that

neither impairment met the diagnostic criteria for a listed impairment. R. 1710 (considering Listing 12.04); R. 1712 (considering Listing 12.06). He assessed Muniz as having moderate restrictions in daily living activities, moderate difficulties in social functioning, and moderate difficulties with concentration, persistence, and pace. R. 1717. He reviewed the consultative examination on March 24, 2011 and her examination for anxiety at El Centro de Corazón on April 25, 2011, as well as records from July and August 2011. He concluded that the alleged limitations were only partially supported by the evidence of record, noting that Muniz was able to care for herself and her two children, cook meals, do chores, drive, shop, and manage money. He concluded that Muniz was somewhat limited by psychiatric symptoms but that the symptoms did not wholly compromise her ability to function independently, appropriately, and effectively on a sustained basis. R. 1719. He also assessed her mental capacity and concluded that Muniz was able to understand, remember, and carry out simple instructions, make basic decisions, attend and concentrate for extended periods, interact with others, accept instructions, and respond to changes. R. 1721-24.

In October 2011, Muniz returned to the Stephen F. Austin Clinic for follow up care. R. 1750-59. On October 21, she complained of sharp abdominal pain for three days, nausea, and emotional stress. Her blood pressure was 116/70. Her medications

were reviewed and labs were ordered.  On October 28, she complained of tingling and numbness in her extremities, headache, and palpitations.  Her blood pressure was 120/70.  She was told to return to the clinic in one week.

On December 5, 2011, Muniz again was treated at Stephen F. Austin Clinic and complained of depression, shortness of breath, and chest pain.  She was treated and told to return to the clinic in one week.  R. 1747-48.  Clinic staff assessed her as being at risk of a heart attack due to her COPD, peripheral vascular disease, hypertension, and hyperlipidemia, and drafted a letter stating, "Current restrictions are no standing, walking, running, or working outside," but "Ms. Muniz may participate in community service that is conducted inside while sitting or standing for short periods with breaks."  R. 1725.

On December 26, 2011, Muniz presented at the emergency room of Bayshore Medical Center with acute bronchitis, complaining of shortness of breath and chest pain.  R. 1726-44.  She was smoking a "few" cigarettes daily but stated that she had told her son she would quit smoking soon, before he brought his newborn baby home. R. 1732.  Her blood pressure was recorded as 148/74, 132/62 and 140/64.  Upon her discharge on December 27, she was feeling better and was not in distress.  R. 1740.

In February 2012, Muniz returned to the Stephen F. Austin Clinic.  R. 1770-79. She stated that she had been to Memorial Hermann's emergency room on February

3, 2011, apparently due to breathing problems, but these records are not before the Court.  Her medications were adjusted and labs were ordered, and Muniz was instructed to return to the clinic in one week.

On April 26, 2012, Muniz was admitted to Bayshore Medical Center.  R. 1780-99.  She complained of sharp, moderate pain that had started the day before in her left chest and radiated to her left arm.   Upon arrival at the emergency room her blood pressure was 201/91, but without medication it dropped to 146/71.  Muniz was admitted and a heart attack was ruled out.  Her medications were adjusted.  She was discharged that same day and instructed to follow up with her primary care physician in one or two weeks.  The diagnoses listed upon her discharge include atypical chest pain, hypertensive urgency secondary to anxiety and panic attack,  morbid obesity, anemia, COPD, and uncontrolled diabetes.

On May 23, 2012, the ALJ in this case conducted an administrative hearing, at which Muniz appeared and testified.  R. 34-70.  Muniz's attorney argued that Muniz had worked consistently for thirteen years, from 1998 through 2010, but recently had been unable to work due to her medications and frequent trips to the hospital.  R. 40.

  Muniz stated that she had stopped working in 2010 because of pain in her legs and feet, and because she frequently was going to the doctor.  R. 47.  She testified that she had tingling and swelling in her legs and needed to lie down three or four times a day

to alleviate the swelling.  R. 48-50.   She further testified that she had frequent

breathing problems due to COPD, asthma, and heart problems.  She stated that she had

her frequent hospitalizations were sometimes due to lack of medication.  R. 51.   She

testified that she had quit smoking "cold turkey" five or six months before the hearing.

R. 54.  She testified that she took medications for anxiety, depression, hypertension,

diabetes, cholesterol, and asthma.  R. 55-58.  She also testified that she used a portable

CPAP machine at night to aid her breathing.  R. 59.

At the hearing, the ALJ took testimony from a vocational expert.  The ALJ

asked the expert to consider a hypothetical person of Muniz's age, education, and

work experience; who was limited to light work that involved only simple, routine,

repetitive tasks and was not performed in a fast-paced production environment; who

must avoid prolonged exposure to fumes, dust, and other environmental irritants; who

could perform only simple work-related decisions; and who was limited to only

occasional interaction with supervisors, co-workers, and the general public.  R. 65.

The expert testified that this hypothetical individual would not be able to perform

Muniz's past relevant work, but could perform other jobs in the economy, in

particular, clothing marker (pricing clerk) and simple assembly work.  R. 66.   He

testified that this work would permit two 15 minute breaks and a 30-60 minute lunch

break.  R. 66.   When asked by Muniz's attorney about a hypothetical person who

needed to lie down for one to two hours per day during the workday, the expert answered that such person would not be able to perform any jobs in the national economy.  R. 67.

On June 25, 2012, the ALJ denied Muniz's application for benefits.  The Appeals Council denied her request for review on May 8, 2013.

In June 2013, Muniz was diagnosed with incurable stage four breast cancer. Muniz filed a subsequent application based on this diagnosis and, on October 16, 2013, she was granted SSI benefits beginning November 1, 2013.  *See* Exhibits A-C to Plaintiff's Motion.  This subsequent application does not have any direct bearing on the denied applications for SSI and disability benefits that are the subject of this appeal.

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a).  *See Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

III.   **STANDARD OF REVIEW**

Judicial review of the Commissioner's denial of disability benefits is limited to two inquiries: first, whether the final decision is supported by substantial evidence on the record as a whole and, second, whether the Commissioner applied the proper legal standards to evaluate the evidence.  *See Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  *Audler*, 501 F.3d at 447 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It is more than a mere scintilla and less than a preponderance.  *Id*.; *Perez*, 415 F.3d at 461; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

When applying the substantial evidence standard on review, the court

scrutinizes the record to determine whether such evidence is present. *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).   In determining whether substantial evidence of disability exists, the court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *Perez*, 415 F.3d at 462 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)).   If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *Id.* at 461 (citing *Richardson*, 402 U.S. at 390); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).   Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).   The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Audler*, 501 F.3d at 447; *Masterson*, 309 F.3d at 272.   In short, conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272.

## IV.   ANALYSIS

### A.   Statutory Basis for Benefits

Muniz applied for both Social Security disability insurance and Supplemental

Security Income (SSI) benefits.  Social Security disability insurance benefits are authorized by Title II of the Social Security Act.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured *and* disabled, regardless of indigence. 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

SSI benefits are authorized by Title XVI of the Social Security Act, and provide an additional resource to the aged, blind and disabled to assure that their income does not fall below the poverty line.  20 C.F.R. § 416.110.  Eligibility for SSI is based on proof of disability and indigence.  42 U.S.C. § 1382c(a)(3) (definition of disability); 42 U.S.C. §§ 1382(a) (financial requirements).   A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled. *Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); 20 C.F.R. § 416.335.  Thus, the month following an application fixes the earliest date from which SSI benefits can be paid. Eligibility for SSI, unlike eligibility for Social Security disability benefits, is not dependent on insured status.

Although these are separate and distinct programs, applicants to both programs must prove "disability" under the Act, which defines disability in virtually identical language.  Under both provisions, "disability" is defined as the inability to "engage

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382c(3)(A) (SSI).  The law and regulations governing the determination of disability are the same for both programs.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

### B.      <u>Determination of Disability</u>

When determining whether a claimant is disabled, an ALJ must engage in a five-step sequential inquiry, as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations; (4) whether the claimant is capable of performing past relevant work; and (5) whether the claimant is capable of performing any other work.  *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.[2]  The claimant has the burden to prove disability under the first four steps.  *Perez*, 415 F.3d at 461; *Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner at Step Five to show that the claimant is capable of performing other substantial

---

[2]      The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations.  *Perez*, 415 F.3d at 461-62.  The Commissioner assesses the RFC before proceeding from Step Three to Step Four.  *Id.*

gainful employment that is available in the national economy.  *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut the finding.  *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Perez*, 415 F.3d at 461 (citing 20 C.F.R. § 404.1520(a)).

In this case, at Step One, the ALJ determined that Muniz had not engaged in substantial gainful activity since June 7, 2010, her alleged onset date.[3]  The ALJ found at Step Two that Muniz had five severe impairments:  diabetes mellitus; COPD; peripheral vascular disease; obesity; and anxiety disorder, not otherwise specified.  At Step Three, the ALJ concluded that Muniz's impairments did not meet or medically equal a listed impairment in the relevant federal regulations.

Before proceeding to Step Four, the ALJ assessed Muniz's residual functional capacity ("RFC") and found that Muniz could perform "light work" with several exceptions:

> [Muniz] has the [RFC] to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except [Muniz] must avoid concentrated or
> prolonged exposure to fumes, odors, dusts, gases, environments with
> poor ventilation, and hot and cold temperature extremes; can perform
> simple, routine, repetitive tasks, not performed in a fact-paced

---

[3]     The ALJ also determined that Muniz met the insured status requirements of the SSA through December 31, 2013.

> production environment, involving only simple, work-related decisions, and in general, relatively few workplace changes; and can have occasional interaction with coworkers, supervisors, and the general public.

R. 24.  At Step Four, the ALJ determined that Muniz was not able to perform any of her past relevant work.  At Step Five, he determined that jobs existed in the national economy that Muniz could perform, including clothing marker, small products assembler, and lawn and garden equipment assembler.  He therefore concluded that Muniz was not under a disability during the relevant period.

### D.   Analysis of Plaintiff's Arguments for Reversal

#### 1.   Step Two Finding

Muniz argues that the ALJ erred at Step Two when he found that Muniz's hypertension was not a severe impairment. Fifth Circuit precedent provides that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (internal citation, quotation marks, and alteration omitted).

The ALJ found that Muniz's "hypertension is 'not severe' (20 C.F.R. §§ 404.1520(a) and (c) 416.920(a) and (c) and SSR 96-3p) in that it causes ***no more than minimally*** vocationally relevant limitations."  R. 22 (emphasis added).

The ALJ noted that Muniz's hypertension was controlled by medication.  *Id*.  He explicitly cited the *Stone* standard and stated that "the term 'severe,' as defined in the regulations, has been given the same construction as that pronounced by the Court of Appeals for the Fifth Circuit [in *Stone*]."  *Id*.

Plaintiff argues that the ALJ's Step Two finding is error because the finding that hypertension causes "no more than minimally vocationally relevant limitations" is in conflict with *Stone*'s requirement that a non-severe impairment have a "minimal effect on the individual" and "would not be expected to interfere with the individual's ability to work."  Plaintiff's Motion, at 7-8 (citing, *inter alia*, *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 805-06 (N.D. Tex. 2009)).  This discrepancy has been found by *Scroggins* and other courts to be slight, but critical, given the Fifth Circuit's holding in *Stone* that the Court would "in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect."  *Stone*, 752 F.2d at 1106.  However, after *Stone*, the Fifth Circuit held that it "does not require the use of 'magic words' for compliance with *Stone*," and that the courts should remand only "'when there is no indication the ALJ applied the correct standard.'"  *Lynch v. Shalala*, 19 F.3d 14, at *3 (5th Cir. 1994) (quoting *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986)).  *See LeBlanc v. Chater*, 83 F.3d 419,

at *2 (5th Cir. 1996).

In this case, the ALJ found at Step Two that Muniz's hypertension was controlled by medication.[4]  The ALJ's finding is supported by substantial evidence in the record.  *See*, *e.g.*, R. 977-78 (on April 25, 2011, Muniz's blood pressure was 120/80 and noted as "stable" on current medications); R. 1690-91 (on August 9, 2011 Muniz was compliant with medications and her blood pressure was 116/66);  R. 1756-57 (on October 21, 2011, Muniz was taking medication for blood pressure and her reading was 116/70).  Muniz has not challenged this finding. The ALJ's finding that Muniz's hypertension was controlled is sufficient to support a Step Two finding under the precise *Stone* standard advocated by Muniz, *i.e.*, that the alleged impairment would have "such minimal effect on [Muniz] that it would not be expected to interfere with [her] ability to work."  *See Stone*, 752 F.2d at 1101.  Notably, Muniz has not alleged any actual limitation on her ability to work caused by her hypertension.

Summary judgment is granted for Defendant on this ground.

### 2.   Credibility Finding

The ALJ found that Muniz's statements regarding "the intensity, persistence and limiting effects" of her symptoms were "not credible to the extent they [were]

---

[4]   An impairment that can be controlled with medication is not disabling. *See Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); 20 C.F.R. § 404.1530(b); 20 C.F.R. § 416.930(b).

inconsistent with [her RFC]."  R. 25.  Muniz argues that this credibility finding is not

supported by substantial evidence.

Plaintiff alleges that the ALJ relied on improper factors when making his

credibility finding, in particular, her inability to afford treatment or medication, her

obesity, and the length of time it took for her to stop smoking.   However, although

the ALJ's opinion mentions each of these factors when assessing her RFC, he did not

explicitly base his credibility finding on them, and did not rely exclusively on these

factors.  R. 24-27.[5]  Rather, the ALJ's RFC finding cites a plethora of supporting

evidence, including multiple citations to her medical records, her ability to conduct

daily activities (including child care, cooking, driving, shopping, and personal

---

[5]     The ALJ did in fact discount some of Muniz's symptoms by noting that Muniz had
a history of noncompliance with her medications.  *See*, *e.g.*, R. 25 (Muniz had not
seen a doctor in the four months prior to the hearing and had a history of
noncompliance with diabetes medications, "suggesting that her symptoms are not as
serious as has been alleged in connection with this application and detract[ing] from
the persuasiveness of her allegations").  This finding was proper under controlling
authority.  Fifth Circuit law provides that "[i]f an impairment reasonably can be
remedied or controlled by medication or therapy, it cannot serve as a basis for a
finding of disability." *Johnson*, 864 F.2d at 348 (citing 20 C.F.R. §§ 404.1530,
416.930; *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir. 1987)).  *See Lopez v.
Massanari*, 273 F.3d 1094, at *1 (5th Cir. 2001); *Hebert v. Barnhart*, 197 F. App'x
320, 323 (5th Cir. 2006).  Plaintiff invokes an exception to this rule, citing to her own
statements that she cannot afford her medications.  Plaintiff's Motion, at 10.
However, the  exception exists for claimants who "cannot afford the prescribed
treatment or medicine[] ***and can find no way to obtain it***." *Lovelace*, 813 F.2d at 59
(emphasis added).  The record contains substantial evidence that, despite periods of
noncompliance with treatment and medication regimens, Plaintiff frequently was able
to obtain medications, and that her condition was improved when she complied with
her medications. *See*, *e.g.*, R. 977-78.

hygiene) and get along with others, the consultative examination by Dr. Swanson, and the physical and psychiatric assessments by medical consultants. R. 25-27. Moreover, the ALJ did not completely dismiss Muniz's account of her symptoms, but instead found that her allegations were not credible to the extent they were inconsistent with her RFC (*i.e.*, a capacity for light work and simple, routine tasks).

Summary judgment is granted for Defendant on this issue.

### 3.    <u>Step Five Finding</u>

Finally, Plaintiff argues that the ALJ's Step Five finding, *i.e.*, his finding that Muniz was capable of performing work existing in the national economy, was not supported by substantial evidence.   In particular, Plaintiff argues that the jobs identified by the ALJ at Step Five require skills that are inconsistent with her RFC, which limited Plaintiff to "simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions." R. 24.

Plaintiff asserts that the RFC's limitation to simple tasks and decisions "restricts Plaintiff to the performance of work having a reasoning level of no more than [one]." Plaintiff's Motion, at 14.  In support, Plaintiff cites to an opinion from the Northern District of Texas that quotes the Dictionary of Occupational Title's descriptions of

reasoning levels one, two and three.[6]  Plaintiff asserts that the jobs identified by the

ALJ at Step Five (*i.e.,* clothing marker and assembler) each required a reasoning level

of two and thus were inconsistent with the RFC.  Plaintiff concludes that, because the

vocational expert's testimony regarding Step Five jobs purportedly was inconsistent

with the information in the Dictionary of Occupational Titles, the vocational expert's

testimony cannot provide substantial evidence for the ALJ's Step Five finding.

The Fifth Circuit has rejected Plaintiff's argument.  In *Carey v. Apfel*, the Court

held:

> To the extent that there is any implied or indirect conflict between the
> vocational expert's testimony and the DOT in this case, we agree with
> the majority of the circuits that the ALJ may rely upon the vocational
> expert's testimony provided that the record reflects an adequate basis for
> doing so. . . . [C]laimants should not be permitted to scan the record for
> implied or unexplained conflicts between the specific testimony of an
> expert witness and the voluminous provisions of the DOT, and then
> present that conflict as reversible error, when the conflict was not
> deemed sufficient to merit adversarial development in the administrative
> hearing.

*Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000).[7]  In this case, as in *Carey*,

---

[6]     *See Otte v. Comm'r, Soc. Sec. Admin.*, 3:08-CV-2078-P BF, 2010 WL 4363400 , at
\*7-\*8 (N.D. Tex. Oct. 18, 2010) (Stickney, M.J.), *report and recommendation
adopted,* 2010 WL 4318838 (N.D. Tex. Oct. 27, 2010).

[7]     The Court notes that in *Otte*, the case cited by Plaintiff, the ALJ made a determination
about the claimant's mental RFC without questioning the vocational expert.  *Otte*,
2010 WL 4363400, at \* 7. The *Otte* court therefore held that the ALJ's decision was
not supported by substantial evidence.  *Id*. at \*8.  By contrast, in the case at bar, the
ALJ questioned the vocational expert about Muniz's limitations on her mental
(continued...)

Plaintiff's counsel did not develop the point at the administrative hearing.   At the hearing, Plaintiff's counsel specifically questioned the vocational expert about the reasoning level for the small products assembler job, and the expert answered that the required reasoning skills were level two.  R. 68.   Counsel then stated that he had no further questions.  R. 69.  In other words, he did not ask the expert to address or resolve the purported conflict between the reasoning level required for the identified jobs and Plaintiff's RFC limiting her to simple work.  Under *Carey*, Muniz cannot now present the conflict as error.

Moreover, multiple courts have held that a job requiring a reasoning level of two is not in conflict with an RFC for simple, routine tasks.  *See Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Hurtado v. Comm'r of Soc. Sec.*, 425 F. App'x 793, 795-96 (11th Cir. 2011); *Gaspard v. Soc. Sec. Admin. Com'r*, 609 F. Supp. 2d 607, 617 & n.22 (E.D. Tex. 2009).

Because the ALJ properly relied upon the testimony of the vocational expert for his Step Five analysis, summary judgment is granted for Defendant on this issue.

## V.    **CONCLUSION**

For the foregoing reasons, it is hereby

---

[7]        (...continued)
abilities and how these limitations would affect her ability to perform certain specific occupations.

ORDERED that Plaintiff's First Amended Motion for Summary Judgment [Doc. # 22] is **DENIED**.   It is further

ORDERED that Defendant's Motion for Summary Judgment [Doc. # 23] is **GRANTED**.

A separate final judgment will issue.

**SIGNED** at Houston, Texas, this **30**[th] day of **May, 2014.**

Nancy F. Atlas
United States District Judge